**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-5

JOHN EDWARD BURR,

Petitioner - Appellant,

v.

DENISE JACKSON, Warden, Central Prison, Raleigh, North Carolina,

Respondent - Appellee.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  William L. Osteen, Jr., District Judge.  (1:01-cv-00393-WO-JEP)

Argued:  September 24, 2021                    Decided:  November 30, 2021

Before WILKINSON, WYNN, and HARRIS, Circuit Judges.

Affirmed by published opinion.  Judge Wynn wrote the opinion, in which Judge Wilkinson and Judge Harris joined.

**ARGUED:**  James P. Cooney, III, WOMBLE BOND DICKINSON (US) LLP, Charlotte, North Carolina, for Appellant.  Kimberly Nicole Callahan, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.  **ON BRIEF:** Ernest Lee Conner, Jr., Greenville, North Carolina, for Appellant.  Joshua H. Stein, Attorney General, L. Michael Dodd, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

WYNN, Circuit Judge:

Petitioner John Edward Burr was convicted after a 1993 trial for the 1991 murder

of infant Tarissa Sue O'Daniel, known to her family as "Susie." He was sentenced to death.

In the decades since, Burr has pursued habeas remedies before the state and federal courts,

including this Court. But this appeal concerns a narrow question: whether the district court

erred in declining to grant habeas relief on the basis of claims under *Brady v. Maryland*

and *Napue v. Illinois* related to transcripts of interviews with two witnesses, Susie's mother

and brother.

Our standard of review is highly deferential to the conclusions of the state post-

conviction relief court. Under that standard of review, we agree with the district court that

Burr is not entitled to habeas relief. Accordingly, we affirm.

I.

Several courts, including this one, have previously laid out the relevant facts and

procedural history of this case in some detail.[1] We do not repeat that full history here, but

instead report only those facts relevant to the issues before us.

A.

Susie was born to Lisa Bridges and her then-husband on April 1, 1991. Shortly

thereafter, Bridges began having an affair with Burr. In late June, Bridges and her children

---

[1] *E.g.*, *Burr v. Jackson*, No. 1:01CV393, 2020 WL 1472359, at *1–6 (M.D.N.C. Mar. 26, 2020); *Burr v. Lassiter*, 513 F. App'x 327, 329–39 (4th Cir. 2013) (per curiam) (unpublished but orally argued); *State v. Burr*, 461 S.E.2d 602, 606–11 (N.C. 1995).

moved with Burr into a trailer next door to another trailer owned by Bridges's stepbrother. Burr quickly became physically abusive toward Bridges.

Around 6:00 P.M. on August 24, 1991, Bridges's eight-year-old son, Scott, tripped over a cord while carrying Susie and fell on a gravel-covered driveway. Bridges and Burr examined Susie after the fall and found her to be uninjured. But early reports about the mechanics of the fall were inconsistent. Bridges and Scott both reported in the weeks afterward that Scott fell on Susie, dropped her, or both. However, at other times during those same early weeks, Bridges and Scott each reported that Scott did *not* let go of Susie and instead cradled her gently as he fell. One of Scott's early reports was made to a social worker on August 27, who "assured him that nothing he had done hurt [Susie]." J.A. 1226.[2]

Late on the night of August 24 or in the early hours of the next morning, Bridges went next door to wash dishes at her stepbrother's home. She left Susie in her crib in Bridges's bedroom. Scott and his younger brother Tony were asleep in another bedroom. Burr also remained at Bridges's trailer.

When Bridges returned forty-five minutes later, she found Susie in her swing in the living room. Burr claimed he had moved Susie from her baby bed to the swing after she woke up. It rapidly became clear that Susie was badly injured—she was covered in bruises; her eyes were unblinking and rolling; and she was unresponsive. Bridges and Burr brought Susie to the county hospital, where they arrived just before 3:00 A.M. on August 25.

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

The emergency room physician found Susie to be unconscious, with a weak pulse and wandering eyes; "intermittently seizing or having seizures"; and presenting with a bulging fontanel, "indicat[ing] some swelling inside the head." J.A. 2812. In addition to the bruising all over her body, X-rays revealed that both of her arms and both of her thigh bones were broken. She also appeared to be suffering from a "closed head injury," though X-rays did not show a skull fracture. J.A. 2819. The physician immediately formed a "high suspicion of abuse," which he asked Bridges about. J.A. 2818. He also contacted the sheriff's department and social services.

Due to the severity of her injuries, Susie was transferred to North Carolina Memorial Hospital at the University of North Carolina at Chapel Hill. There, she was examined by a trauma team that included the chief of pediatric surgery. The chief of pediatric radiology reviewed Susie's X-rays and CT scan and concluded that Susie had a "depressed skull fracture" that was mere hours old. J.A. 2713. By contrast, the fractures in both of Susie's thigh bones showed evidence of early healing. The radiologist estimated those fractures were eight to nine days old, with a range of three days on either side of the estimate. Susie's arm fractures did not show signs of healing, and the radiologist testified that they could have happened at the same time as the head injury or up to five days previously.

A pediatric neurologist also reviewed Susie's CT scan and agreed that she had a "depressed skull fracture." J.A. 2840. He noted that there was no external wound on the scalp. And he found that Susie exhibited symptoms, such as bilateral retinal hemorrhages, that were indicative of "shaken baby syndrome," "a specific kind of injury where the baby has a whiplash kind of injury from being shaken back and forth." *Id.*

4

Susie died from her injuries on August 27, 1991. The medical examiner concluded that Susie's cause of death was a closed head injury, and that the manner of death was homicide. Burr was arrested the next day.

B.

Burr was tried before a jury in a guilt phase that took place over the course of twelve trial days between March 29 and April 16, 1993. The trial evidence was extensive and included testimony from Burr, Bridges, Scott, other relatives, investigating officers, examining doctors, a social worker, and the pathologist who performed Susie's autopsy.

Scott testified at trial that he cradled Susie in his arms as he fell with her on August 24, such that she never hit the ground. Bridges and another witness who saw the fall, an eleven-year-old relative named Jonas, confirmed Scott's rendition. And Burr himself testified that Scott held onto Susie when they fell. That said, the trial evidence also included Burr's testimony that he saw Scott "laying on top of Susie." J.A. 3063. And it included testimony that, in the early hours of August 25, Bridges told a deputy sheriff that Scott "fell on" Susie, and that she similarly told a social worker on August 25 that Scott had "dropped" Susie and "fell on her." J.A. 3617, 3779. This contradicted her trial testimony that Scott "didn't drop his sister," nor did he "fall on [her]." J.A. 2013. In other words, the jury had before it competing testimony regarding the fall. In any event, Bridges, Burr, and several other witnesses testified that they examined Susie after the fall and that she was not injured at that time.

Five doctors testified at trial: the emergency room physician at the county hospital who saw Susie around 3:00 A.M. on August 25; the chief of pediatric surgery at North

5

Carolina Memorial Hospital, who was part of the trauma team that evaluated Susie when she arrived there around 6:00 A.M. on August 25; the chief of pediatric radiology at the second hospital, who reviewed Susie's X-rays on August 25; the pediatric neurologist at the second hospital who examined Susie in the pediatric intensive care unit on August 25 and reviewed her CT scan; and the pathologist who performed Susie's autopsy on August 28. Each doctor was qualified as an expert witness in their field of medical practice.

The five testifying doctors unanimously agreed that the fall with Scott around 6:00 P.M. on August 24 could not have caused Susie's lethal injuries. They confirmed that Susie had no cuts, scratches, or other abrasions on her, such as one might expect if she fell with any force on gravel. And they made clear that her head injury—whether or not her skull was actually fractured—would have required a concentrated blow from a blunt object that would almost certainly not have resulted from a fall, even if Susie's head had struck the gravel surface. For example, the pediatric surgeon testified that he had "seen situations where somebody lands on top of a child . . . and they can end up with bruising of the liver or even [a] ruptured liver," but Susie's injuries "don't occur with that type of fall." J.A. 2915. The pediatric radiologist testified that the skull fracture was "a very unusual fracture in a very unusual place" that would "take a relatively confined direct blow to that area" with "a great deal of force" to produce, because where the fracture occurred was "in a portion of the skull" that is "somewhat protected because it's a little depressed in," so "the rest of the skull would hit first." J.A. 2726–27, 2738. The pediatric neurologist testified that Susie had a "depressed skull fracture" caused by significant force from a blunt object, akin to Susie having been "thrown against something" in a car accident, not from "a simple

bump or fall." J.A. 2840, 2847–48. He further testified that a fall from a height of roughly three feet would not create "this kind of depressed skull fracture" where the "whole thing [is] caved in." J.A. 2849. The creation of such an injury, he explained, instead required striking by a smaller, blunt object. Accordingly, he concluded that her injuries were not accidental.

The pediatric neurologist also testified that retinal hemorrhages, such as those seen in the back of both of Susie's eyes, would not be caused by a fall, but rather "would require really very violent shaking." J.A. 2876. He further testified that, while Susie's condition might have worsened in the hours following her injury, she would have been "significantly ill, and obviously in trouble from the very beginning." J.A. 2851. That is, "whatever the injury was[,] from that point on the child should have been obviously not right," even to a layperson, with loss of consciousness occurring "within minutes to an hour or so." J.A. 2851, 2854. Other doctors agreed. Finally, the pathologist testified that Susie was covered with bruises across her body that were consistent with strikes from a blunt object, and that she had bruising on her neck that was "consistent with marks that could be caused by a handprint." J.A. 2964.

In the face of this evidence, defense counsel's trial strategy was not to suggest that Scott's fall with Susie had been the cause of her injuries. In fact, counsel explicitly and vigorously disclaimed that view in both their opening and closing statements, and elicited agreement from Burr that the fall was "highly unlikely" to be the cause of the injuries Susie received. J.A. 3111. Instead, counsel sought to suggest that someone else—most notably Bridges—could have caused Susie's injuries. This included arguing that Bridges's

7

testimony that she did not know Susie had fractured limbs lacked credibility; noting that Bridges had much more access to Susie than Burr did in the weeks leading up to her death; and introducing testimony from a witness who claimed to have once seen Bridges slap Susie so hard that she fell off a couch.

For its part, the State relied on the timeline of events; testimony from Scott, who at the time of trial was ten years old; testimony to undermine that of Burr's witness regarding the couch-slapping incident; and character evidence showing Burr's physically abusive side, including testimony that he could be rough with his own toddler son.

In his testimony, Scott told the jury that, after his mother left to go wash the dishes on the night of August 24, he was awoken by "hammer noises." J.A. 2769. He then heard Susie crying and Burr "mumbling" before Susie's crying ceased. *Id.* Scott testified that he "[j]ust went back to bed" after this incident because he was "scared" to go check on Susie. J.A. 2770. Scott also testified that he had seen Burr surreptitiously "shaking" Susie on multiple occasions.

The jury convicted Burr of first-degree murder, felonious child abuse, and assault on a female (for abuse of Bridges). The court sentenced him to death at the jury's recommendation. The Supreme Court of North Carolina affirmed on direct appeal, and the U.S. Supreme Court denied certiorari. *See State v. Burr*, 461 S.E.2d 602, 631 (N.C. 1995); *Burr v. North Carolina*, 517 U.S. 1123, 1123 (1996).

C.

Burr filed a motion for appropriate relief ("MAR") in state court in 1996. He included with his MAR several affidavits from non-treating doctors who claimed that Susie's injuries could have resulted from the fall with Scott.[3]

The MAR was denied the following year. But in July 1998, the Supreme Court of North Carolina remanded the case for reconsideration in light of a new statutory requirement that the State produce "the complete files of all law enforcement and prosecutorial agencies involved" in investigations leading to death sentences. N.C. Gen. Stat. § 15A-1415(f) (1996); *see State v. Burr*, 511 S.E.2d 652, 652 (N.C. 1998) (citing *State v. McHone*, 499 S.E.2d 761 (N.C. 1998); *State v. Bates*, 497 S.E.2d 276 (N.C. 1998)).

Under the remand order, the State produced tape recordings of interviews with Scott and Bridges that had been conducted in February 1993, shortly before trial, but were never given to defense counsel. Burr filed an amended MAR, alleging that the interviews represented exculpatory evidence that should have been turned over pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and that they showed that the State relied on testimony it knew would leave the jury with a materially false impression, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). The state court rejected the amended MAR in 2000. The Supreme Court of North Carolina denied certiorari.

Burr then turned to the federal courts, filing a habeas petition in the Middle District of North Carolina in 2001. The parties conducted extensive discovery, including

---

[3] The medical license of one of the doctors who provided Burr with a supporting affidavit has since been revoked. *See Burr*, 513 F. App'x at 339 n.4.

9

introducing new medical evidence. In 2009, the magistrate judge recommended that the district court grant habeas relief because competent counsel would have secured an independent medical expert and "presented evidence that the actual mechanism of [Susie]'s death was an accidental fall." *Burr v. Branker*, No. 1:01CV393, 2009 WL 1298116, at \*7 (M.D.N.C. May 6, 2009).

The district court did not file its order addressing the magistrate judge's recommendation until 2012, at which point the Supreme Court had issued its decision in *Cullen v. Pinholster*, 563 U.S. 170 (2011). *Pinholster* held that federal review pursuant to 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 180. The district court obliged, confining its review to the record that was before the MAR court and disregarding the parties' discovery from the federal proceedings. *Burr v. Branker*, No. 1:01CV393, 2012 WL 1950444, at \*1 (M.D.N.C. May 30, 2012).

Nevertheless, the district court agreed with the magistrate judge and granted habeas relief on the basis of ineffective assistance of counsel. *Id.* at \*9. But, applying our highly deferential standard of review under 28 U.S.C. § 2254, this Court reversed. *Burr v. Lassiter*, 513 F. App'x 327, 329 (4th Cir. 2013) (per curiam) (unpublished but orally argued). The case returned to the district court for evaluation of Burr's remaining claims.

In 2015, the State uncovered and disclosed an *additional* recording of a conversation between Bridges and investigators in December 1992, a few months before trial. Only some, but not all, of the 1992 recording had previously been disclosed to Burr. Burr moved to amend the record under Rule 7 of the Rules Governing Section 2254 Cases to include

10

the new transcript of the 1992 conversation.[4] The State did not object, and the district court agreed.

The district court held argument on the grounds remaining in Burr's petition, after which it denied the petition and declined to issue a certificate of appealability. *Burr v. Jackson*, No. 1:01CV393, 2020 WL 1472359, at \*29 (M.D.N.C. Mar. 26, 2020). Burr appealed only as to his *Brady* and *Napue* claims, and we granted a certificate of appealability.

## II.

We review the district court's decision de novo. *Valentino v. Clarke*, 972 F.3d 560, 579 (4th Cir. 2020). But our review of the state MAR court's decision is highly deferential.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") empowers federal courts to "entertain" applications for writs of habeas corpus filed by convicted state prisoners "on the ground that [they are] in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "But the manner in which the federal courts may entertain such an application depends considerably on how the state court treats a petitioner's claims" and, in particular, whether its decision qualifies as an "adjudication on the merits." *Valentino*, 972 F.3d at 574; *see* 28 U.S.C. § 2254(d). If it does, then our review is severely circumscribed: we may only disturb the state court's ruling if it (1) "resulted in a decision that was contrary to, or involved an unreasonable application of,

---

[4] Rule 7 provides that "the judge may direct the parties to expand the record by submitting additional materials relating to the petition," such as "letters predating the filing of the petition, documents, exhibits, and answers under oath to written interrogatories propounded by the judge," as well as affidavits. 28 U.S.C. § 2254 Rule 7(a), (b).

clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule" but "unreasonably applies it to the facts." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). For such an "unreasonable application" to exist, the state court's decision must have been "so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility for fairminded disagreement.*" *White v. Woodall*, 572 U.S. 415, 420 (2014) (emphasis added) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

Similarly, a state court decision is "based on an unreasonable determination of the facts" only where the "factual determination [is] 'sufficiently against the weight of the evidence that it is objectively unreasonable,'" which means "'it must be more than merely incorrect or erroneous.'" *Williams v. Stirling*, 914 F.3d 302, 312 (4th Cir. 2019), *as amended* (Feb. 5, 2019) (quoting *Winston v. Kelly* (*Winston I*), 592 F.3d 535, 554 (4th Cir. 2010)). Further, the state court's determination of factual issues is "presumed to be correct" and may only be overturned by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Accordingly, the § 2254(d) standard results in "a formidable barrier to federal habeas relief." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). However, one aspect of the case at bar gives us pause. Burr contends that the state MAR court's 1997 and 2000 orders "adopted verbatim the findings proposed by the State in [its] proposed Order[s]." Opening Br. at 21 (discussing 2000 order); *see also id.* at 15 (same regarding 1997 order). And in

12

some cases, the verbatim adoption of a proposed order can heighten the standard of review, loosening the amount of deference the reviewing court gives to the order under review.[5] *See Jefferson v. Upton*, 560 U.S. 284, 294 (2010) (per curiam). So the question before us is whether we should afford § 2254 deference to state court orders in a capital habeas proceeding where the orders largely track proposed orders filed by the State. We need not determine whether such deference is *always* applicable in such cases, however, because we conclude that, here, § 2254 deference applies.

The Supreme Court stated in *Anderson v. City of Bessemer City*, an employment-discrimination case, that "even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 572 (1985). *Anderson* reversed a decision from this Court in which we applied a heightened level of scrutiny to the record where the district court "directed [the] plaintiff's counsel to submit proposed findings of fact, conclusions of law, and an appropriate judgment"; allowed the defendant to respond; and adopted "[t]he substance of [the] plaintiff's submission . . . as the final opinion in the case." *Anderson v. City of Bessemer City*, 717 F.2d 149, 152 (4th Cir. 1983), *rev'd*, 470 U.S. 564; *see id.* at

---

[5] To be sure, Burr does not argue that the verbatim adoption of the State's proposed orders changes our standard of review. And normally, "[a] party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (internal quotation marks and alterations omitted). Nevertheless, "[o]ur case law is clear that 'parties cannot waive the proper standard of review by failing to argue it,'" including in habeas cases. *Richardson v. Kornegay*, 3 F.4th 687, 701 n.9 (4th Cir. 2021) (quoting *United States v. Venable*, 943 F.3d 187, 192 (4th Cir. 2019)). Rather, we "must independently assure ourselves" of the appropriate standard of review. *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 286 (4th Cir. 2018).

13

156. The Supreme Court held that the district court did "not appear to have uncritically accepted findings prepared without judicial guidance by the prevailing party," as it had issued a "preliminary memorandum" before soliciting the proposed opinion and "the findings it ultimately issued . . . var[ied] considerably in organization and content from those submitted by [the plaintiff]'s counsel." *Anderson*, 470 U.S. at 572–73.

After *Anderson*, "we have taken a more lenient approach to district court opinions that closely mirror a party's submissions." *Alig v. Quicken Loans Inc.*, 990 F.3d 782, 790 n.8 (4th Cir. 2021). However, we and other courts have continued to look to the facts of each case to determine whether *Anderson* applies.[6] For example, applying pre-AEDPA federal habeas law, the Supreme Court suggested in *Jefferson v. Upton* that verbatim adoption of proposed findings in habeas cases might be problematic in some circumstances. *Jefferson*, 560 U.S. at 294 (vacating and remanding "for the lower courts to determine . . . whether the state court's factual findings warrant a presumption of correctness").

But *Jefferson* involved a particularly extreme example in which the petitioner alleged that the state court asked the State in an ex parte conversation "to draft the opinion

---

[6] *See Alig*, 990 F.3d at 790 n.8 (applying *Anderson* where "[t]he district court engaged extensively with the issues over several years" and where its opinion "included substantial sections the court wrote itself—as well as language adopted from [*the appellants'*] briefs"); *Aiken Cnty. v. BSP Div. of Envirotech Corp.*, 866 F.2d 661, 676–77 (4th Cir. 1989) (applying *Anderson* despite the court's near-verbatim adoption of an ex parte proposed order where the opposing party had the opportunity to air its views fully and the court appeared to have exercised independent judgment); *Bright v. Westmoreland Cnty.*, 380 F.3d 729, 732 (3d Cir. 2004) (reversing and remanding a § 1983 case for further consideration where the issue was not merely "*findings of fact*" but instead "a District Court *opinion* that is essentially a verbatim copy of the appellees' proposed opinion").

14

of the court." *Id.* at 287. And some of our sister circuits have applied *Anderson*—and therefore have not altered their deferential standards of review—in less extreme post-AEDPA habeas cases, including after *Jefferson*. *See Barksdale v. Att'y Gen. Ala.*, No. 20-10993-P, 2020 WL 9256555, at *18 (11th Cir. June 29, 2020) (unpublished) ("We have held that a state court's verbatim adoption of the prosecution's proposed order is entitled to AEDPA deference as long as (1) both parties 'had the opportunity to present the state habeas court with their version of the facts' and (2) the adopted findings of fact are not 'clearly erroneous.'" (quoting *Rhode v. Hall*, 582 F.3d 1273, 1282 (11th Cir. 2009) (per curiam))); *Green v. Thaler*, 699 F.3d 404, 415 (5th Cir. 2012) (applying *Anderson* in a capital habeas case even though "the state court requested [the proposed order] *ex parte*, and signed [it] verbatim," where "the state court had already rendered a judgment from the bench" and the petitioner "apparently had an opportunity to object to the findings in a motion to strike he filed in the state court"); *see also Nichols v. Scott*, 69 F.3d 1255, 1276 (5th Cir. 1995) (applying *Anderson* in a capital habeas case where the state court "adopted verbatim the [S]tate's proposed findings of fact and conclusions of law").

We need not lay down any blanket perimeters for how *Anderson* applies in capital habeas cases generally, and we decline to do so where the parties have not briefed this issue. Under the circumstances of this case, we conclude that *Anderson* applies, and therefore the MAR court's opinions are entitled to full § 2254 deference.

Burr filed his initial MAR in 1996, after which the State filed a combined response to and motion for summary denial of the MAR in March 1997. The State attached a proposed 114-page order to that response. The record does not indicate that Burr filed a

response to the motion for summary denial, or a reply related to the MAR.[7] Instead, six months later, Burr filed an amended MAR. The state court denied the MAR in October 1997 in a 116-page order. The state court's filed order copied the State's proposal nearly verbatim, with the exception of a handful of minor modifications and the addition of a three-page section at the end to address the amended MAR.

Following the Supreme Court of North Carolina's 1998 remand of the case, Burr filed his second amended MAR in February 1999. The State again filed a combined response to and motion for summary dismissal of the second amended MAR in May 1999, to which it attached a 43-page proposed order and memorandum opinion. Burr apparently did not reply, instead filing a third amended MAR in October 1999, to which the State filed a response in November. The state MAR court ultimately denied the MAR in June 2000. At 68 pages long, its filed order was largely based on the proposed order but included substantial additions by the court as well.

---

[7] State law may have required Burr to seek permission from the court to file a reply. *See State v. Riley*, 528 S.E.2d 590, 593 (N.C. Ct. App. 2000); N.C. Gen. Stat. § 15A-1420(b1) (specifically noting, in both its 1997 and current versions, that the judge could direct the State to file a response to the defendant's MAR, but not mentioning an opportunity for the defendant to reply); *cf. State v. Vinh Nguyen*, 821 S.E.2d 665 (N.C. Ct. App. 2018) (unpublished table decision) (noting that the State moved to strike the defendant's reply as improper, though dismissing the motion as moot). *But see State v. Howard*, 783 S.E.2d 786, 792 (N.C. Ct. App. 2016) (noting that the defendant filed a reply without noting that he first sought permission to do so); *State v. Chekanow*, No. 14 CRS 50306 & 50307, 2019 N.C. Super. LEXIS 478, at *1 (May 7, 2019) (same); *State v. Lynch*, No. 08CRS58929, 58934, 2014 N.C. Super. LEXIS 237, at *1 (June 11, 2014) (same); *cf. State v. Lane*, No. 14 CRS 50314-15, 2019 N.C. Super. LEXIS 450, at *7 (Jan. 9, 2019) (noting that the defendant filed a response in opposition to the State's motion to dismiss his MAR without noting that he first sought permission to do so). Regardless, even if Burr was required to seek such permission, the record does not show that he did so. Nor did he attach his own proposed order to his amended MAR.

The MAR court's 2000 order is primarily at issue in this appeal, as it contains the *Brady* and *Napue* analyses. But the 1997 order is also relevant because of its discussion of the cause of Susie's death, and the 2000 order "reconsider[s]" and then incorporates the 1997 order. J.A. 1786. Accordingly, the question is whether *Anderson* applies to the 1997 and 2000 orders.

We conclude that it does. We have carefully compared both filed orders with the proposed orders and are convinced that the filed orders represent the state court's own work. Certainly, the 1997 filed order includes only minor changes from the proposed order. But the 2000 order, which "reconsidered" the 1997 one, shows more input from the court. *Id.* The 2000 order still adopted nearly all of the State's proposed order, but Burr is incorrect to state unequivocally that the adoption was "verbatim." Opening Br. at 21. The court made both major and minor changes throughout, including adding substantial sections of text. For example, in discussing ineffective assistance of counsel, the court's order expands a one-sentence paragraph into a section spanning several pages. *Compare* J.A. 1726, *with* J.A. 1792–98. As another example, and of relevance to the *Brady* and *Napue* claims, the MAR court noted that "[Burr]'s transcriptions of the prosecutors' discussion with [Bridges] demonstrate that the prosecutors were most concerned about assuring that she testified truthfully." J.A. 1830. That statement is absent from the equivalent point in the State's proposed order.

To summarize, in this case, Burr had an opportunity to contest the proposed orders. They were not filed ex parte. Nor did the state court simply rubber-stamp the proposed orders—a comparison of the proposed and final 2000 orders reveals that the court carefully

17

considered the issues and made modifications where appropriate, and the 2000 order makes clear that the court had also reconsidered the closer-to-verbatim 1997 order. Those factors combined convince us that the MAR court's orders represent its own work and are thus entitled to our deference.

The preparation of proposed orders by parties in capital habeas cases appears to persist as a practice in North Carolina. *E.g.*, *State v. Allen*, 861 S.E.2d 273, 280 (N.C. 2021) ("[T]he MAR court sent the parties a Memorandum of Ruling asking the parties to draft proposed orders disposing of [the petitioner's] MAR . . . claims."); *cf. N.C. State Bar v. Sutton*, 791 S.E.2d 881, 896 (N.C. Ct. App. 2016) (noting, in an attorney discipline case, that "[i]t is the accepted practice in North Carolina for the prevailing party to draft and submit a proposed order that the decision-making body may then issue as its own—with or without amendments"). To be clear, though we are sympathetic about the substantial caseloads facing state trial judges, there are serious problems with this practice, as we and other courts have noted previously. *E.g.*, *Aiken Cnty. v. BSP Div. of Envirotech Corp.*, 866 F.2d 661, 677 (4th Cir. 1989) (labeling the "near-verbatim adoption" of proposed findings of fact and conclusions of law "less than ideal"); *Anderson*, 470 U.S. at 572 (noting that the Court had "criticized" the "verbatim adoption of findings of fact prepared by prevailing parties"); *Jefferson*, 560 U.S. at 293–94 (same).[8] Those concerns are particularly

---

[8] *See also, e.g.*, *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1268 (11th Cir. 2021) (noting the Eleventh Circuit's "sharp[] critique[s]" of this practice); *Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 829–30 (10th Cir. 2005) (stating that the near-verbatim adoption of proposed findings of fact and conclusions of law is "[r]egrettabl[e]" and that it "provides little aid on appellate review"); *Basso v. Stephens*,

18

pronounced when the state court adopts the State's proposed order in a capital case, where the need for an adversarial process and a neutral arbiter is at its zenith.

But, in light of evidence that Burr was on notice of the proposed order and that the state court judge exercised judicial discretion in adopting the State's proposed order, we conclude that it is appropriate to apply *Anderson* under these circumstances even as we continue to "strongly criticize" the practice of verbatim (or close-to-verbatim) adoption of proposed opinions. *Hamm v. Comm'r, Ala. Dep't of Corr.*, 620 F. App'x 752, 756 n.3 (11th Cir. 2015) (per curiam). Accordingly, we apply § 2254 deference to Burr's claims in this appeal.

III.

Turning to the merits, we begin with the unreasonable determination of fact Burr alleges pursuant to § 2254(d)(2). We then evaluate the MAR court's discussion of his *Brady* and *Napue* claims under § 2254(d)(1). We close by analyzing whether we can consider the suppressed transcript that was not turned over until 2015, and if so, whether it makes a difference to Burr's claims.[9] We hold that the district court correctly rejected Burr's habeas petition.

---

555 F. App'x 335, 342 (5th Cir. 2014) (noting the practice is "troubling"); *Philbrook v. Ansonia Bd. of Educ.*, 925 F.2d 47, 53 (2d Cir. 1991) (collecting cases on this point).

[9] In addition to this transcript, Burr also seeks to rely on appeal on medical evidence first introduced during the federal proceedings. *Pinholster* squarely precludes our consideration of this evidence. *Pinholster*, 563 U.S. at 180–81.

19

A.

Burr only alleges one factual error on appeal: he claims that the MAR court erred in concluding "that Susie died of a depressed skull fracture." Opening Br. at 30. To satisfy § 2254, he would have to show that "the state [MAR] court based its decision[] 'on an objectively unreasonable factual determination in view of the evidence before it, bearing in mind that factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary.'" *Elmore v. Ozmint*, 661 F.3d 783, 850 (4th Cir. 2011) (quoting *Baum v. Rushton*, 572 F.3d 198, 210 (4th Cir. 2009)) (citing § 2254(e)(1), (d)(2)). An "unreasonable determination of the facts," as the phrase is used in § 2254(d)(2), "is not merely an incorrect determination, but one 'sufficiently against the weight of the evidence that it is *objectively unreasonable*.'" *Gray v. Zook*, 806 F.3d 783, 790 (4th Cir. 2015) (emphasis added) (quoting *Winston I*, 592 F.3d at 554).

Burr cannot satisfy this hefty burden. As an initial matter, the MAR court did not find that Susie *died* of a depressed skull fracture; rather, it is clear the court was persuaded by the medical testimony at trial that Susie's cause of death was a brain injury resulting from child abuse. However, the court did find that she *had* a depressed skull fracture. We will assume that is the factual finding Burr takes issue with. In light of the conflicting testimony on that point, the MAR court's finding was not "objectively unreasonable." *Id.*

At trial, the chief of pediatric radiology and a pediatric neurologist each testified that Susie had a skull fracture. The radiologist took the jury through the CT scans and showed them where he saw "a fracture to the skull." J.A. 2712. He explained that there was "a notch, as if something had hit the skull and pushed this portion of the skull into the inner

table of the skull itself," creating a "little v-shaped depression in the skull." J.A. 2713–14. The neurologist reviewed the same CT scan and testified that "the skull was caved in in that area." J.A. 2847. Perhaps for that reason, Burr's counsel referred to a "skull fracture" in argument to the court. J.A. 4219.

Certainly, other experts who viewed the skull using other methods did not see a fracture. The initial treating physicians in the emergency room performed an X-ray that "revealed no obvious [skull] fracture," J.A. 2829, and the autopsy report indicates "SKULL: No fractures," J.A. 1012. The chief of pediatric surgery testified that Susie "had one area that *looked like* a fracture on the [X]-ray and the CT scan," but that an area of the skull can be pushed in like a dent on a ping-pong ball, without the bone actually breaking. J.A. 2906 (emphasis added). The pathologist who performed the autopsy agreed, testifying that this is particularly possible for infants, because their bones "are not completely calcified, so they are more likely to be deformed [meaning dented in or depressed] by an injury rather than broken." J.A. 2979.

In other words, the disagreement was *not* between, say, some experts saying Susie had a "linear skull fracture[] or crack in the skull" and others saying she had a *depressed* injury, J.A. 2859, or between some experts saying her skull was fractured in one spot and others saying it was dented in a different spot, or between some experts saying she had a head injury and others disputing that point altogether. The experts agreed that Susie's skull had an indentation on the left side with associated brain injuries. They disagreed only as to whether the bone was actually fractured at the site.

21

Given the competing medical expert testimony on the latter fact, it was not "sufficiently against the weight of the evidence" so as to be "objectively unreasonable" for the MAR court to conclude that the chief of pediatric radiology and pediatric neurologist correctly interpreted the CT scan as demonstrating a fracture of the skull. *Winston I*, 592 F.3d at 554. "To the extent multiple interpretations of the facts may exist, the . . . state court's determination of the facts . . . is not [objectively] unreasonable." *Duke v. Allen*, 641 F.3d 1289, 1294 (11th Cir. 2011). After all, "[i]f reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (internal quotation marks and alterations omitted); *cf. Wainwright v. Goode*, 464 U.S. 78, 85 (1983) (holding, under pre-AEDPA law, that the lower court "erred in substituting its view of the facts for that of the [state court]" where "the record [was] ambiguous" and therefore both views "[found] fair support in the record").

We further note that, *even if* Burr is correct that the MAR court's finding that there was a skull fracture was erroneous, "we are at a loss to see much critical significance" regarding "the existence or nonexistence of an actual fracture to the skull itself." *Burr*, 513 F. App'x at 344 n.6. As we noted the last time this case was before us, "[a]ll of the treating physicians and the medical examiner agreed that the cause of Susie's death was blunt force head trauma, and its resulting swelling and pressure in the brain, and that significant force was necessary to cause this trauma. Burr presented no evidence to the state MAR court that the treating physicians would have changed their opinions regarding child abuse vis-à-vis accident based upon the difference in the radiographic evidence and the autopsy report."

*Id.* It is hard to see how the MAR court's decision could have been "*based on*" a fact that, in the context of all the other evidence in this case, represented a minor discrepancy. 28 U.S.C. § 2254(d)(2) (emphasis added); *cf. DelValle v. Armstrong*, 306 F.3d 1197, 1201 (2d Cir. 2002) (rejecting a § 2254(d)(2) claim where the state supreme court's misstatement of fact was "irrelevant"); *Green v. Travis*, 414 F.3d 288, 298 (2d Cir. 2005) (Sotomayor, J.) (distinguishing *DelValle* because, in *Green*, the precise facts "were not tangential" to the claim, "but central to it," which "distinguishe[d] [*Green*] from those situations[, like *DelValle*,] in which a state court's misunderstanding of the facts of a case had little bearing on the state court's ultimate resolution of the claim"). So, we conclude that Burr has not demonstrated that the MAR court's decision was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2).

B.

Burr's § 2254(d)(1) claims fare no better. He contends that the MAR court's decision "involved an unreasonable application of" *Brady*, *Napue*, and their progeny. *Id.* § 2254(d)(1). We cannot agree.

i.

We begin with the applicable legal principles. In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "To establish a *Brady* violation, the accused must demonstrate that the evidence was" (1) "suppressed by the prosecution;" (2) "favorable to the defendant, either because it [was]

23

exculpatory or impeaching;" and (3) "material." *Horner v. Nines*, 995 F.3d 185, 204 (4th Cir. 2021). There is no dispute that the evidence here was suppressed, but the parties disagree on the other two prongs. Because the parties and the MAR court focused chiefly on materiality, and because we can affirm the district court's denial of the petition on that basis, we train our analysis primarily on that prong.

"Favorable 'evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 206 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Thus, "*Brady* does not 'automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.'" *Id.* (quoting *Bagley*, 473 U.S. at 677).

"[U]nder [the Supreme Court's decision in] *Napue* [*v. Illinois*], the government 'may not knowingly use false evidence, including false testimony, to obtain a tainted conviction' or 'allow[] it to go uncorrected when it appears.'" *United States v. Chavez*, 894 F.3d 593, 599 (4th Cir. 2018) (quoting *Napue*, 360 U.S. at 269). False testimony includes both perjury and evidence that, "though not itself factually inaccurate, . . . creates a false impression of facts which are known not to be true." *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967). Convictions "obtained by the knowing use of perjured testimony [are] fundamentally unfair, and must be set aside if there is any reasonable likelihood that the

false testimony could have affected the judgment of the jury." *Chavez*, 894 F.3d at 601 (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

ii.

Burr makes several interpretive moves to position Bridges and Scott's testimony as vital and therefore his *Brady* and *Napue* claims based on their testimony as viable. Pointing to medical evidence introduced before the MAR court and the conflicting testimony regarding whether Susie had a skull fracture, Burr argues that Susie died from a closed head injury but did not have a fractured skull. If Susie did not have a fractured skull, Burr contends, it is possible that her head trauma resulted from being dropped—such as in the fall with Scott—rather than from a concentrated blow. Therefore, he argues, by the time of the MAR proceedings, "the only basis for the State's theory that the fall [with Scott] did not cause the fatal injury, was the description of that fall at trial by" Bridges and Scott. Opening Br. at 34. Thus, Burr posits that Bridges and Scott's credibility was absolutely essential to the case, because "[e]vidence about whether the fall could have caused the injury . . . was literally the entire case." *Id.* at 32. And therefore, Burr's theory goes, he can satisfy the materiality element of the *Brady* and *Napue* claims because anything that undermines the credibility of such key witnesses necessarily calls into question the validity of the jury's verdict.

The central problem with Burr's argument is that the State's case was not so entirely reliant on Bridges and Scott, or on their descriptions of the fall, as he suggests. We have already noted "the overwhelming medical evidence that Susie was a victim of child abuse." *Burr*, 513 F. App'x at 345. While we made that comment in the different context of

25

analyzing the effectiveness of the assistance of counsel, the record evidence remains the same. The conclusion that abuse, rather than the fall with Scott, caused Susie's death was supported by: (1) significant medical testimony from treating physicians and the pathologist, including regarding the type of head injury, the limb fractures, the retinal hemorrhages, and the bruising all over Susie's body—such as a handprint-shaped bruise on her neck—all of which was consistent with abuse rather than an accidental fall; (2) eyewitness testimony, albeit somewhat mixed, from those who saw the fall, which included Jonas in addition to Bridges and Scott; (3) testimony from several individuals, including Burr, who examined Susie after the fall and found her, in their lay opinions, to be uninjured; and (4) medical expert testimony that Susie would have been so clearly unwell immediately after sustaining the head injury that ultimately killed her that even a layperson would have recognized she was in danger, such that the head injury must have occurred later than the time of the fall (around 6:00 P.M.) if Susie did not show symptoms until after midnight.

With this background and our deferential standard of review in mind, we can easily dispense with Burr's *Brady* and *Napue* claims.

iii.

Burr argues that the MAR court unreasonably applied *Brady* when it concluded that "any inconsistencies between the trial testimony of [Bridges and Scott] and their pre-trial comments to the prosecutors are of *de minimis* significance." J.A. 1827. He contends that the undisclosed tapes would have enabled trial counsel to materially undermine Bridges and Scott's testimony on crucial points related to Scott's fall with Susie and the incidents when Scott had previously seen Burr shake Susie. Therefore, he argues, the tapes are

material because it is reasonably likely that "had the [tapes] been disclosed to the defense, the result of the [trial] would have been different." *Horner*, 995 F.3d at 206. We disagree as to Bridges, Scott, and the evidence considered in the aggregate.

We begin with Burr's arguments related to the suppressed 1993 interview of Bridges. Burr cherry-picks statements from that interview in an attempt to demonstrate that the interview provides new, damning information. Much of what he picks out is made up of questions from the prosecutors about how Bridges could not have known that Susie had at least some fractured limbs for days before she sustained her head injury. But Bridges's credibility as to Susie's demeanor before the night in question was thoroughly aired at trial. It had to have been apparent to the jury that any testimony that Susie was happy and did not cry too much before August 24, 1991, was questionable given that she had at least some fractured limbs for days beforehand. But that dubious testimony did not only come from Bridges's family; Burr also testified that Susie seemed "fine" earlier in the evening of August 24. J.A. 3190–91. Moreover, the evidence about Susie's demeanor was inconsistent, as Bridges and her family *also* testified that Susie had been crying a lot over the preceding weeks, which they chalked up to her throat infection, a result of oral thrush. Bridges explained that Susie "cried constantly" because of the pain in her throat and contended that she assumed this was related to oral thrush rather than realizing that Susie had broken bones. J.A. 2209. Accordingly, the conversation between Bridges and prosecutors about whether and to what degree Susie was in pain before the night of August 24 is cumulative evidence to that provided at trial. Such cumulative evidence "is generally

27

not considered material for *Brady* purposes." *Juniper v. Zook*, 876 F.3d 551, 571 (4th Cir. 2017) (quoting *Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013)).

Burr points to another statement in the transcript that was also aired at trial. In the suppressed transcript, Bridges said that Burr "did not act like he would hurt [Susie]." J.A. 1571. Burr contends that this contradicts Bridges's trial testimony, which "listed a litany of Burr's abusive behavior suggesting he could hurt a child." Opening Br. at 17. But at trial, Bridges was also asked why it had not occurred to her immediately that Burr could have caused Susie's injuries. She explained this was because she does not hurt children, "and you can't see it in someone else. . . . [P]eople hurt people, but they don't hurt a child." J.A. 2076; *see also* J.A. 2183–84 (showing Bridges being challenged at trial with statements she made to a social worker soon after Susie was injured, in which she said she could not identify who hurt Susie).

Burr further contends that Bridges "admit[ted]" in the transcript "that she asked her family to lie for her." Opening Br. at 40. He overstates the limited nature of Bridges's concession, in which she acknowledged that she had sought to prevent one of her sisters from saying "that the baby cried all the time" because she was worried about "look[ing] bad." J.A. 1587. Still, this statement could certainly have undermined Bridges's credibility had the defense known about it and been able to impeach Bridges's testimony with it. But again, substantial contradictory evidence at trial allowed the jury to weigh whether Bridges and her family were being truthful regarding Susie's condition. The MAR court's conclusion that this undisclosed statement would not have changed the outcome of the trial was not unreasonable.

Finally, Burr argues that the prosecutors coached Bridges to provide a believable story about why she did not realize that Burr was abusing Susie. For example, the prosecutor suggested that Bridges's rationale could have been, "I was so in love with this guy that I didn't want my sister to know, or say anything to him if she saw them getting spanked. . . . I was love blind or something." Opening Br. at 40–41 (quoting J.A. 1586). But the prosecutor went on to add, "[o]r whatever it was." *Id.* at 41 (quoting J.A. 1586). That is, the prosecution asked Bridges to provide whatever story was the accurate one. Further, the MAR court concluded that "the prosecutors were most concerned about assuring that [Bridges] testified truthfully." J.A. 1830. That was not an objectively unreasonable conclusion. The transcript reveals that prosecutors repeatedly urged Bridges to tell "[e]very little [shred] of" the truth, "no matter how bad it ma[de] [her] look." J.A. 1585. So, in our view, Burr's "coaching" argument cannot provide the requisite showing of materiality.

Burr's arguments regarding the suppressed interview with Scott are equally unpersuasive. To be sure, Scott comes across in the interview transcript as, in the magistrate judge's words, "confused, scared[,] and easily susceptible to suggestion." *Burr*, 2009 WL 1298116, at *18. So, Burr contends, "[i]n the hands of competent counsel, Scott's repeated contradictions, his embellishments, and his mistakes could have been used to prove to the [j]ury that his memory of [the fall and the shaking incidents] was not trustworthy." Opening Br. at 45. But the jury could assess for themselves how much weight to give Scott's testimony. At the time of trial, Scott was only ten years old and was testifying about traumatic events that occurred when he was eight. His testimony at trial was also littered

29

with "I don't remember" statements. *E.g.*, J.A. 2774–89. So even without the suppressed interview transcript, it is apparent from the trial evidence alone that Scott was an imperfect witness, a point that defense counsel could and did drive home to the jury. *E.g.*, J.A. 4054–55 (defense counsel pointing in closing to how Scott's story regarding the fall had changed over time). The interview transcript would have been cumulative evidence on that point.

Moreover, Scott's trial testimony that he "cradled" Susie during his fall such that she never hit the ground was echoed by testimony from Bridges and Jonas and was supported by the lack of abrasions on Susie's skin, "[e]ven over the area on the left part of the skull" where her head was most badly injured. J.A. 2916. And, to the extent Scott's description of the fall can be disputed by statements he made in the suppressed transcript, it was already able to be disputed by similar evidence provided to Burr before trial. As noted, in the weeks following Susie's death, both Scott and Bridges at times described the fall as Scott "dropp[ing]" Susie or "fall[ing] on top of her." J.A. 2262, 3398; *see also* J.A. 3415, 3425–26, 3779. Finally, Burr contends that prosecutors planted in Scott's mind the idea that he did not hurt Susie, and that this led him to change his description of the fall. But Scott's descriptions had shifted over time even before that point, and a social worker was the first person in the record to urge him that he had not hurt Susie—just days after she sustained her fatal head injury.

Burr also argues that the suppressed interview is revealing regarding Scott's description of the incidents in which he saw Burr "shake" Susie. Specifically, he alleges that the transcript demonstrates that Scott's story about those incidents shifted in response to leading questions. But this argument fails for at least three reasons.

30

First, Burr does not directly explain why the MAR court's reading of the record—which rejected Burr's view of the transcript—was objectively unreasonable.

Second, he fails to explain how the transcript would have allowed him to impeach Scott's testimony. The MAR court found that any inconsistencies in Scott's testimony were "of *de minimis* significance." J.A. 1842. This was not unreasonable, particularly because Burr had an opportunity to cross-examine Scott at trial on the question of whether prosecutors had planted the idea of Burr shaking Susie in Scott's mind. At the time of trial, Burr was aware of Scott's September 5, 1991, statement that he had never seen Burr "do anything" to Susie, such as whipping her—a statement that contradicted his trial testimony that he had seen Burr shake Susie multiple times. J.A. 1655. Defense counsel questioned Scott about that statement at trial. Additionally, Scott conceded at trial that he did not mention the shaking incidents to anyone else before he told the prosecutors about them. He explained that this was because he was scared of Burr and thought that, if he told Bridges about Burr shaking Susie, Burr might kill Bridges. Burr has not clarified how having access to the suppressed transcript would have assisted his trial strategy rather than just being cumulative to the evidence he was already aware of.

Third and finally, Burr cannot sustain his burden to show as objectively unreasonable the MAR court's conclusion that, had Burr had the opportunity to impeach Scott's testimony using this transcript, the result of the trial would not have been different. There is no way to know if the jury believed Scott's story about the shaking incidents based on the evidence before them. It is possible they did not, as he was a child whose credibility could be questioned given that he was frightened of Burr and believed Burr had killed his

31

baby sister. But even if the jury believed Scott was being truthful about Burr shaking Susie, and even if the impeachment value of the suppressed transcripts would have been the evidence to tip them against finding Scott credible on *that* point, there was plenty of other evidence from which they could nevertheless infer that Burr was Susie's assailant in the assault that led to her death.

For example, as the MAR court noted, the evidence "demonstrate[d] that [Burr] abused Susie on [an]other occasion[]": Bridges testified to a prior incident in the weeks before Susie's death in which Bridges had awoken around 4:00 A.M. to the sound of Susie screaming loudly and found Burr in another room holding her. J.A. 1426. The MAR court further found that the jury "had the opportunity to carefully evaluate [Burr]'s [own] extended testimony and demeanor on the witness stand" and "obviously conclud[ed] that [Burr] was not being truthful with them" about the events of the night in question. J.A. 1832. To name just some of the other circumstantial evidence from which the jury could have inferred guilt, there was testimony that Burr was abusive toward Bridges and his own toddler son; numerous witnesses testified that Susie was fine before she was left alone with Burr on the night in question; Bridges's niece testified that she went to Bridges's trailer during the forty-five-minute window in which Bridges was washing dishes next door, and that at that time she leaned over to kiss Susie and saw no bruises or markings on her; medical experts testified that Susie's seizure-like symptoms, which she exhibited when Bridges returned to her trailer, would have occurred very soon after the head injury; and medical experts testified that the retinal hemorrhages Susie displayed "would require really

very violent shaking," J.A. 2876, and that her head injury would require a "great deal of force," J.A. 2739, 2847.

Our view of the suppressed transcripts of conversations with Bridges and Scott does not change when we consider its possible impeachment value in the aggregate. For the reasons described above, many of the aspects of the transcripts Burr points to are cumulative to testimony that was presented, or impeachment opportunities that already existed, at trial. When the cumulative evidence is put aside, what remains is too insignificant to pose a realistic possibility of altering the trial outcome had Burr's counsel been aware of it before trial. *See* J.A. 1827 (MAR court finding that "any inconsistencies between the trial testimony of [Bridges and Scott] and their pre-trial comments to the prosecutors are of *de minimis* significance"). The MAR court concluded that, "[a]t the bottom line," Burr "ha[d] not presented anything that undermine[d] the Court's confidence in the outcome of the trial proceeding." J.A. 1842. We cannot say that this was objectively unreasonable.

In short, the MAR court's conclusion that Burr had not shown "a reasonable probability that[,] had [the tapes] been disclosed[,] the result of the trial would have been different," J.A. 1827, did not amount to an "unreasonable application" of *Brady*, 28 U.S.C. § 2254(d)(1).[10]

---

[10] Burr also briefly argues that the MAR court "diminish[ed] the value of impeachment for *Brady* purposes" and that this led it to "engage[] in an interpretation that [was] contrary to *Brady* and established law." Opening Br. at 39; *see* 28 U.S.C. § 2254(d)(1) (relief may be granted where the state court's decision was "contrary to . . . clearly established Federal law"). He does not explain how the MAR court "diminished the

iv.

We reach the same conclusion regarding Burr's *Napue* claim. As noted, *Napue* requires courts to set aside a conviction as violative of due process if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Chavez*, 894 F.3d at 601. Further, "[t]he government does not have to solicit the false evidence; it is enough if the government allows the evidence to go uncorrected when it surfaces." *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987).

Burr's *Napue* claim rests on the same undisclosed evidence that forms the basis of his *Brady* claim. He does not contend that the State knowingly relied on perjured testimony, but he does allege that the State denied him due process by creating false impressions of critical facts at trial. He points to three key ways in which he claims the State did this. But we are not persuaded.

First, Burr contends that the prosecutors allowed Bridges and Scott to present a "sanitized" rendition of Scott's fall with Susie that was "simply not true." Opening Br. at 49. Specifically, the suppressed 1993 interview tape with Bridges "show[s] that as late as several weeks before trial, Bridges and the State continued to refer to Scott dropping Susie, or falling with her." *Id.* at 48–49. Thus, the theory goes, the trial testimony that Scott

---

value of impeachment for *Brady* purposes," and our review of the MAR court's order reveals that the MAR court explicitly recognized that evidence can be favorable for *Brady* purposes "either because it is exculpatory, or because it is impeaching." J.A. 1822 (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999)). The MAR court applied the correct standard; it simply found the evidence to be immaterial.

"cradled" Susie "created a false impression of the fall—a 'sanitized' version which [prosecutors] knew to be sanitized." *Id.* at 49.

This argument fails for at least three reasons. One, "[m]ere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *Griley*, 814 F.2d at 971 (citing *Overton v. United States*, 450 F.2d 919, 920 (5th Cir. 1971) (per curiam)). Two, the trial evidence included the contradictory descriptions of the fall that Scott and Bridges had provided over time, such as testimony that Bridges told a deputy sheriff that Scott "fell on" Susie and told a social worker that Scott had "dropped" Susie. J.A. 3617, 3779. So the evidence presented at trial was not a clean, "sanitized" version of events; it included competing statements, including contradictory statements from the same witnesses. Three, and relatedly, even without access to Bridges's suppressed 1993 statement, Burr had plenty of evidence from which he could have impeached Scott and Bridges's "sanitized" accounts of the fall, namely, their inconsistent statements about it. And he did indeed use these discrepancies to undermine their credibility. *See* J.A. 4021 (defense counsel noting in closing that the defense had questioned witnesses about the fall and stating that those questions "[went] to the credibility of the witnesses").

Burr's second argument in favor of his *Napue* claim is similar. He alleges that the State "did not believe Bridges[] and her family when they said that Susie was uninjured before the evening of August 24." Opening Br. at 49. In the suppressed 1993 interview, prosecutors accused Bridges of having coordinated her children's and relatives' stories to give the impression that Susie was a "normal" and "[h]appy" baby who rarely cried, saying

that her family's testimony had been "like a script." J.A. 1593. And Bridges indicated that she had tried to prevent one of her sisters from saying "that the baby cried all the time" out of concern that she would "look bad." J.A. 1587. Yet, according to Burr, she presented the same "script" on the witness stand without a word from the prosecution.

In that same transcript, however, one of the prosecutors specifically stated that he was "playing a devil's advocate"—that he was pressing Bridges's story for weak points because he was "looking at [how] the defense attorneys are going to jump on you." J.A. 1579. So, it is not clear that the prosecutors actually disbelieved Bridges; they may have simply been preparing her for the hard questions they knew would be coming at trial. Indeed, the MAR court found that the prosecutor's "devil's advocate" statement "reveal[ed] [their] motive." J.A. 1829.

Further, the question of how Susie behaved before the night of August 24 was thoroughly aired at trial. The jury heard *both* evidence that Susie was a happy baby who did not cry much, *and* evidence that she had been crying quite a bit in the weeks leading up to the night of August 24 due to pain in her throat. So, again, the jury was not left with a "sanitized" version of events—they were given competing testimony that they had to weigh. The jury could judge for themselves how the family's "script" accorded with the medical facts and, if it did not, factor that into their credibility determinations.

Third and finally, Burr alleges that prosecutors were wrong to rely so heavily on Scott's testimony when they knew he had trouble remembering facts and was prone to embellish. But, again, the jury could make its own determination of how much weight to give the statements of a young child who repeatedly stated that he could not remember key

36

details. Burr has not pointed to any "false impression" about Scott's testimony that prosecutors should have been aware of and flagged but that the jury would not also have been aware of after listening to Scott's testimony. So, again, the MAR court did not err by rejecting this claim.

In sum, we cannot say that the MAR court's determination that the *Napue* claim was without merit was unreasonable "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

v.

That leaves us with one final question. We have concluded that the MAR court did not base its opinion on unreasonable determinations of fact or unreasonably apply clearly established federal law based on the record the court had before it in 2000. But what are we to make of the suppressed transcript of a 1992 conversation with Bridges that was not fully turned over to Burr until *2015*—decades after trial and fifteen years after the proceedings before the MAR court wrapped up? May we consider this transcript, even though it was not part of the record before the MAR court?

Burr urges us to do so. And this request raises numerous fascinating questions about how the Supreme Court's decisions in *Brady* and *Pinholster* intersect. We ultimately conclude, however, that we need not resolve these questions because, even if we consider the transcript, it does not alter our analysis.

Some background will help explain why this is a difficult question. Section 2254(d) prevents federal courts from granting habeas relief on "any claim that was *adjudicated on the merits* in State court proceedings" unless the state court's decision "was contrary to, or

involved an unreasonable application of, clearly established Federal law" (§ 2254(d)(1)) or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" (§ 2254(d)(2)). 28 U.S.C. § 2254(d) (emphasis added). Section § 2254(d)(2), on its face, restricts the federal court's evaluation of claims that were adjudicated on the merits by the state court to the evidence that was before the state court. *Pinholster*, 563 U.S. at 185 n.7. And the Supreme Court has instructed that federal habeas review under § 2254(d)(1) of claims adjudicated on the merits in state court is similarly restricted to the record before the state post-conviction relief court. *Id.* at 180–81.

But "[u]nderpinning the Supreme Court's discussion in *Pinholster* is the terse acknowledgment that the habeas petitioner's claims [in that case] *had been* adjudicated on the merits in state-court proceedings." *Winston v. Pearson* (*Winston II*), 683 F.3d 489, 501 (4th Cir. 2012) (emphasis added). And we have held, even after *Pinholster*, that a claim was *not* "adjudicat[ed] on the merits for purposes of § 2254(d)" when the state court made its decision "on a materially incomplete record." *Id.* at 496 (quoting *Winston I*, 592 F.3d at 555–56). "In this rare scenario, the gloves come off: The federal habeas inquiry is more penetrating, and—if consistent with statute and the Rules Governing § 2254 Cases—we may hear evidence that would otherwise be immaterial under § 2254(d)'s limited review." *Valentino*, 972 F.3d at 576. In these circumstances, § 2254(d) deference does not apply, and federal courts instead review the claim de novo, applying deference only to any factual findings the state court actually made pursuant to § 2254(e)(1). *Winston II*, 683 F.3d at 496, 500–01; *see also Valentino*, 972 F.3d at 576.

*Winston* and related cases provide a narrow exception to *Pinholster* that we have held arises where the "state court shuns its primary responsibility for righting wrongful convictions and refuses to consider claims of error." *Valentino*, 972 F.3d at 576. Thus, we have applied the exception in scenarios where a state court "unreasonably refuse[d] to permit further development of the facts of a claim." *Gordon v. Braxton*, 780 F.3d 196, 202 (4th Cir. 2015) (quoting *Winston II*, 683 F.3d at 496) (internal quotation marks omitted); *cf. Hurst v. Joyner*, 757 F.3d 389, 399 (4th Cir. 2014) (petitioner could develop claim under § 2254(e)(2) where "the state MAR court unreasonably denied [his] motion for further evidentiary development"). "In this circumstance, we do not offend the principles of 'comity, finality, and federalism' that animate AEDPA deference because the state court has 'passed on the opportunity to adjudicate [the] claim on a complete record.'" *Gordon*, 780 F.3d at 202 (quoting *Winston I*, 592 F.3d at 555, 557). Put another way, "[w]hen a state court forecloses further development of the factual record, it passes up the opportunity that exhaustion ensures." *Winston II*, 683 F.3d at 496 (quoting *Winston I*, 592 F.3d at 555). But that raises the question: What if the state court made its decision on a materially incomplete record, not through the fault of the *state court* itself, but instead because the *State* suppressed evidence, in potential violation of *Brady*?

That is the situation we face regarding the tape recording of the 1992 interview of Bridges. The Supreme Court of North Carolina remanded the MAR court's initial denial of Burr's petition in order for the State to comply with N.C. Gen. Stat. § 15A-1415(f). At the time, that statute required the State, "to the extent allowed by law, [to] make available to [a] capital defendant's counsel the complete files of all law enforcement and

39

prosecutorial agencies involved in the investigation of the crimes committed or the prosecution of the defendant."[11] N.C. Gen. Stat. § 15A-1415(f) (1996). So, here, the *state courts* did not prohibit Burr from obtaining the tape recording in question. Rather, it was the *State* that failed to comply by turning over all relevant documents.[12]

The U.S. Supreme Court has contemplated a similar scenario in dicta—dicta that we partially relied on in *Winston II*. *Pinholster* held that, for claims adjudicated on the merits in state court, the petitioner "must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Pinholster*, 563 U.S. at 185. In dissent, Justice Sotomayor criticized that interpretation as precluding relief for some petitioners with *Brady* claims. She contemplated the following scenario, which is not unlike the situation before us now: A petitioner "diligently attempt[s] in state court to develop the factual basis of a claim that prosecutors withheld exculpatory witness statements in violation of *Brady*," but "[t]he state court denie[s] relief on the ground that the withheld evidence then known d[oes] not rise to the level of materiality required under *Brady*." *Id.* at 214 (Sotomayor, J., dissenting). However, before the deadline for filing a federal habeas petition passes, "a state court orders the State to disclose additional documents the petitioner had timely requested under the State's public records Act. The disclosed documents reveal that the State withheld other exculpatory witness statements, but state law would not permit the petitioner to present the new evidence in a successive petition." *Id.* at 214–15. Justice

---

[11] The same statutory requirement exists today, but it is no longer restricted to capital defendants.

[12] Whether that failure was intentional or accidental is irrelevant for *Brady* purposes. *Brady*, 373 U.S. at 87.

Sotomayor noted that "it is unclear how [such a] petitioner can obtain federal habeas relief after" *Pinholster*. *Id.* at 215.

In a responsive footnote, the *Pinholster* majority "suggested . . . that the prohibition on new evidence might not always apply." *Hanna v. Ishee*, 694 F.3d 596, 606 (6th Cir. 2012). The Court stated that, while it "d[id] not decide where to draw the line between new claims and claims adjudicated on the merits," the facts of Justice Sotomayor's hypothetical "may well present a *new claim*." *Pinholster*, 563 U.S. at 186 n.10 (majority opinion) (emphasis added). The majority made this assertion even though, in the stated hypothetical, "the new evidence merely *bolster[ed]* a *Brady* claim that was adjudicated on the merits in state court." *Id.* at 215 (Sotomayor, J., dissenting) (emphasis added). And our decision in *Winston II* relied in part on *Pinholster*'s "tacit acknowledgment that [a] hypothetical petitioner [presenting a *Brady* claim] would be free to present new, material evidence." *Winston II*, 683 F.3d at 501.

We are left, however, with a plethora of unanswered questions. Most notably for present purposes, even if we can consider new *Brady* evidence—as *Pinholster* suggests and as we noted in *Winston II*—what does that mean for our standard of review?[13] Our

---

[13] Another question posed by this case, but which we need not answer here, is whether it matters that the State did not object below to the inclusion of the 2015 transcript in the record, that the district court opted to include it in the record pursuant to Rule 7 of the Rules Governing Section 2254 Cases, that the State has not appealed that ruling, or that the State continues to take the position that we can review the 2015 transcript. Our sister circuits have suggested the answer is no. *See Frazier v. Bouchard*, 661 F.3d 519, 528 (11th Cir. 2011) (holding that *Pinholster* precluded the court from considering "the expanded record[] presented to the district court" under Rule 7); *Moore v. Mitchell*, 708 F.3d 760, 780, 782 (6th Cir. 2013) (applying *Pinholster*'s prohibition on new evidence even "when

*Winston* line of cases considers the *entire claim*, not just the new evidence, de novo, albeit with the appropriate deference to the state court for factual findings it could actually make based on the evidence before it. *See id.* at 492–93, 496–97, 500–01 (affirming a grant of habeas relief after having remanded to the district court to reconsider the entire claim de novo—with deference to "relevant factual findings made by the state court" under § 2254(e)(1)—where the petitioner alleged his trial attorneys were ineffective for failing to raise a claim that "his mental retardation categorically barred imposition of a death sentence" and where new evidence did not fundamentally alter the claim so as to render it unexhausted); *Valentino*, 972 F.3d at 576 (noting that if the claim was not adjudicated on the merits by the state court, "we must remand to the district court for *de novo* review and a possible evidentiary hearing"). Arguably, the same rule should apply for *Brady* claims: although individual pieces of evidence could be analyzed either de novo or with § 2254(d) deference, depending on whether or not they were before the state court, *Brady* also asks us to consider evidence in the aggregate. *Juniper*, 876 F.3d at 568. An aggregate review is more easily performed if all of the evidence is to be reviewed under the same standard.

That said, our sister circuits considering *Brady* claims post-*Pinholster* have taken approaches that differ both from each other and from our *Winston* approach. The Sixth Circuit has evaluated the previously disclosed evidence that was before the state court

the parties jointly move to expand the record," reasoning that "by agreeing to look at evidence beyond the state record[,] we would be permitting the parties to declare their own standard of review"); *Champ v. Zavaras*, 431 F. App'x 641, 655 (10th Cir. 2011) ("Although [*Pinholster*] dealt with new evidence that the district court admitted in the context of an evidentiary hearing, this newly articulated rule applies with equal force to any expansion of the record under Habeas Rule 7.").

under the § 2254 standard, while evaluating evidence discovered during the federal habeas proceedings de novo to determine whether it supported a *Brady* claim. *Jones v. Bagley*, 696 F.3d 475, 486–87 (6th Cir. 2012); *see also Hanna*, 694 F.3d at 610 (reviewing new evidence de novo). By contrast, the Ninth Circuit has evaluated the new materials only to determine if, combined with the old materials, they presented a "potentially meritorious" *Brady* claim, at which point the court remanded the case to the district court with instructions to stay federal proceedings so the petitioner could present his claim "in the first instance to [the] state court." *Gonzalez v. Wong*, 667 F.3d 965, 972 (9th Cir. 2011).

We need not, and do not, resolve this question today. Even assuming, purely for the sake of argument, that we may consider the entirety of Burr's *Brady* claim de novo, we would still affirm the denial of Burr's petition. *See Stokley v. Ryan*, 659 F.3d 802, 809 (9th Cir. 2011) (analyzing a claim assuming that *Pinholster* did and, alternatively, did not apply, and holding that "[e]ven considering the new evidence, we conclude that [the petitioner] has not presented a colorable claim of ineffective assistance of counsel"); *Hanna*, 694 F.3d at 610 (opting to deny a *Brady* claim related to newly discovered evidence on the merits, notwithstanding a failure to exhaust).

We need not dwell long on the evidence that was before the state MAR court. For the reasons discussed at length above, Burr has not shown that the suppressed transcripts, individually or in combination, were material for *Brady* purposes—that there "is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Horner*, 995 F.3d at 206 (quoting *Bagley*, 473 U.S. at 682). Although our analysis above paid due deference to the state MAR court, it

43

would not change if we were to consider the evidence de novo. Burr has not come close to establishing that the jury would not have found him guilty had the defense been aware of the suppressed transcripts, which would have provided at most cumulative or tangential impeachment opportunities.

That analysis does not change when we consider the 1992 transcript first fully revealed in 2015, which was not before the state MAR court. Burr's counsel conceded below that this "new" evidence was largely duplicative of evidence already in the record. And several details he focuses on before this Court were actually included in evidence he had access to during the trial or MAR proceedings.[14]

The only truly new evidence Burr points to is that the full transcript "reveals that the prosecutors spent considerable time with Bridges showing her autopsy pictures and attempting to distinguish between the bruising caused by medical treatment and the bruises caused by the abuse." Opening Br. at 26. Burr contends that "the prosecutors described the

---

[14] Burr cites Bridges's description of Scott's fall, but that or a materially indistinguishable description was included in a version of the transcript that Burr concedes was formerly provided to him. Another detail, which Burr describes as "a previously undisclosed accusation of abuse towards Susie," was in fact discussed at trial. Opening Br. at 26 (citing J.A. 5528–29 (describing an incident in which Bridges's niece accidentally tripped over Susie's car seat)); *see, e.g.*, J.A. 2349–51 (trial testimony about this incident). Similarly, Burr argues that the transcript shows that "interviewers further questioned Bridges about whether she beat Susie and how she could not notice that her daughter's arms and legs had been broken for some time." Opening Br. at 26. But that, too, was discussed at length at trial. Finally, there is *no* evidence in the newly disclosed transcript (or anywhere else in the record) regarding "an incident when Bridges slapped her infant out of a car seat with such force that she flew across the floor," as Burr claims. *Id.* at 29; *see also id.* at 43.

bruises they believed were caused by medical care [to Bridges] so that her testimony could be confined to bruises that existed before Susie went to the hospital." *Id.*

But, at trial, the sources of the bruising were exhaustively covered by the pathologist. In front of the jury, the pathologist drew circles on photographs of Susie's body to note which bruises were caused by medical interventions such as the insertion of intravenous lines. Bridges's trial testimony regarding which bruises were present on Susie before her trip to the hospital was cumulative to that of a medical expert aware of the types of bruising that would be caused by medical intervention, so evidence that would have impeached Bridges's testimony on that point is of limited value. *Cf. Juniper*, 876 F.3d at 571 ("Suppressed evidence that would be cumulative of other evidence . . . is generally not considered material for *Brady* purposes." (quoting *Johnson*, 705 F.3d at 129)).

Further, the transcript does not directly undermine Bridges's testimony. At most, the suppressed transcript would have provided the defense an opportunity to impeach Bridges's cumulative testimony on this point by questioning her about alleged coaching by the prosecution related to the bruises. We conclude that this evidence is not enough to support a *Brady* claim. Burr "has not convinced us that there is a reasonable probability that the jury would have returned a different verdict if [Bridges's] testimony [about Susie's bruises] had been . . . impeached" in this manner. *Strickler v. Greene*, 527 U.S. 263, 296 (1999).

Finally, in the circumstances of this case, where the new material is of the same kind as, and largely cumulative of, the old material, and relates only to a tangential issue, we readily conclude that considering the transcript finally revealed in 2015 would not alter our

calculation above regarding the "aggregate effect" of the evidence. *Cf. Jones*, 696 F.3d at 489 (concluding that the new evidence did not tip the scales of the "cumulative effect" because there was "otherwise strong circumstantial evidence of [the petitioner's] guilt").

Accordingly, we leave the questions surrounding the *Brady* exception to *Pinholster* for another day when the issue has been more squarely presented and more thoroughly briefed. Even considering all the suppressed evidence, old and new, de novo, we conclude that Burr cannot satisfy *Brady*.

IV.

This is a deeply serious case, both because of the nature of the crime and because of the punishment. But our standard of review renders the analysis of the only claims before us straightforward. Under § 2254(d), the state court's judgment stands unless it is contrary to or involves an unreasonable application of clearly established federal law, or unless it is based on an unreasonable determination of the facts. And here, the MAR court did not base its decision on an unreasonable determination of the facts, nor did it unreasonably apply the principles the Supreme Court laid out in *Brady* and *Napue*. Even if we consider the suppressed transcript that was not before the state court, moreover, our analysis does not change. We affirm the district court's decision to deny the petition for habeas relief.

*AFFIRMED*